In the Matter of Robert P. Hill, Appellant, against William Lyman, Individually and as President Justice of the Municipal Court of the City of New York, Respondent.

First Department, December 8, 1953.

*Emanuel Redfield* for appellant.

*Nathaniel L. Goldstein, Attorney-General* (*Irving L. Rollins* of counsel; *Wendell P. Brown* with him on the brief), for respondent.

*William G. Mulligan, Mandeville Mullally, Jr., Francis Bourne Upham, III,* and *John A. Wiener* for Association of the Bar of the City of New York, *amicus curiæ.*

BERGAN, J. Having served as a juror in the Municipal Court, the petitioner wrote a letter published in the *New York Times* describing his experiences and impressions. The letter was critical of the court, its physical facilities and of some of its justices.

The letter was published June 30, 1953. Three days later the petitioner was served with a subpœna issued by the President Justice of the Municipal Court requiring him to appear on July 9, 1953, " in a certain investigation with respect to the contents of your letter to the New York Times ". One hearing was held at which time petitioner and others were sworn and the investigation was adjourned and continued.

By this proceeding maintained in the Supreme Court against the President Justice of the Municipal Court, the petitioner seeks to stop the investigation by an order prohibiting the President Justice " from proceeding with any hearings in the matter ". The single question raised before us in this form of proceeding is one of power. The court at Special Term has held that the President Justice of the Municipal Court had authority to make and pursue this inquiry and accordingly dismissed the petition to prohibit it; we review that order.

Among the grounds upon which petitioner seeks to terminate the investigation is that his constitutional right of freedom of speech has been invaded by the institution of the inquiry in the Municipal Court. The argument is advanced under this point in petitioner's brief that a man's right of freedom of speech " may not be infringed even when criticism is made of the judiciary ". This opens to examination the right of the citizen to criticize judges and courts and the methods by which this right may be pursued.

Long experience has demonstrated that the health of democratic institutions of government has rested on the freedom of the citizen to evaluate them critically and in great measure on his interest in doing so. Our courts are as much the product of the democratic society in which they function as are the executive officers, the administrative agencies, and the legisla-

tive bodies; and all are enriched and improved by the same stream of appraisal and evaluation. The case of the judge criticized or the court criticized is on quite the same footing as the case of the administrator criticized or the legislator criticized. Criticism of the courts has, indeed, been an important part of the traditional work of the lawyer in the prosecution of appeals, in the written law review or law journal article, and in discussion at the forum of professional groups.

But it is important to recognize that the area of judicial criticism is not narrowed down exclusively to an informed professional appraisal of the technical mistakes of judges, but the field is open to the citizen at large to say what he thinks about his courts. That what he says may not have technical competence is neither to hold that what he thinks has no value nor that he should not be allowed to say what he thinks.

Traditionally, however, courts have regarded themselves able to gain a practical measure of insulation from the pressure of criticism designed to influence the decision in a case actually being tried or in the process of being decided. Where a court has in hand the adjudication of one man's rights against another's, it becomes important that the process be free from external pressures. An impartial court could not readily examine and decide contests fairly unless it had the concomitant power to keep itself free at crucial points of decision. The work of the judge in this respect differs from the work of the administrator or legislator who deal not with conflicting private rights but with public policies.

The judge has to see to it that the unpopular and the hunted man gets the same kind of treatment as the man well-received and well-respected. The judges at common law took the view that criticism of the handling of a particular case could be regarded as a form of pressure after decision was actually made as well as while it was under advisement and they assumed to punish both.

But the courts of New York have followed a policy of treating criticism of the handling of a particular case after it is decided as a right of the citizen in the same way that he would have the right to criticize generally judicial procedures and practices. A good illustration of this rule is to be found in *People ex rel. Supreme Court* v. *Albertson* (242 App. Div. 450) which holds that criticism in a radio broadcast of the conduct of a judge after the decision had actually been made, was not, under the facts of that case, punishable as a contempt. This, indeed, is the general present rule in the United States: `` Criticism of

the conduct of a judge with respect to past cases or matters finally disposed of generally does not constitute contempt ''. (17 C. J. S., Contempt, § 30, subd. [b], p. 44.) Where the criticism is false and libelous, the judge may sue for libel, but he has this privilege not as a judge but as a right he shares in common with other citizens.

We are of opinion, then, that the juror had the right to express and publish his criticism of the court and of the judges with whom he served; but we think also that the President Justice of the Municipal Court had the power, indeed, the duty, to undertake to make investigation into his own court which the juror as petitioner in this proceeding seeks to prohibit.

The statute which governs that court expressly vests power in its President Justice to receive '' and shall cause to be investigated all complaints presented to him pertaining to the court or to the justices, officers or employees thereof '' (N. Y. City Mun. Ct. Code, § 7, subd. 7). The subdivision authorizes the issuance of subpœnas and the swearing of witnesses in connection with such an inquiry.

It is argued by petitioner that the powers of the President Justice thus given are to be exercised only when a complaint is actually '' presented to '' him. We ought not to give these words such a narrowly literal reading. We would suppose that a complaint about the subjects dealt with in the subsection made by a responsible juror and printed in a periodical of general circulation could be deemed '' presented '' to the President Justice and his power to act upon such a complaint seems fairly inferred for the statutory language. If we could not find the power in the language itself we would assume readily that such power would be deemed the inherent right of the court.

The juror was sworn as a witness, but that is a common method of conducting well-measured inquiries into facts by agencies with the power of inquiry. There was Bar Association representation at the inquiry. If the juror took the trouble to write the letter it must be assumed that he would feel something ought to be done about the matters complained of.

The juror's complaint about the physical conditions in the quarters of the court met with full acceptance from the President Justice. The inquiry into the other aspects of the juror's charges suggests a reassuring willingness by the court to examine itself.

One of the judges criticized by the juror was sworn and examined as part of the inquiry. In dealing with an issue of critical fact between a juror who stands alone on unfamiliar

ground and a judge who is a member of the court itself, unusual pains must be taken by the inquiring judicial officer to protect the juror from undue pressure and to assure him that the inquiry is free from such pressure. Despite the evident effort of the President Justice to conduct the hearing in this spirit, we think this assurance should have been made somewhat more explicit.

We hold that the President Justice had the power and the duty to conduct the inquiry and the petitioner does not show legal ground to prohibit it. The order of the Special Term should be affirmed, with $20 costs and disbursements.

COHN, J. P., BREITEL, BASTOW and BOTEIN, JJ., concur.

Order unanimously affirmed, with $20 costs and disbursements to the respondent. [See *post*, p. 707.]